IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| LABORERS' DISTRICT COUNCIL OF VIRGINIA HEALTH AND WELFARE TRUST FUND, et al., | Civil Action No. 7:12cv0555 |
| Plaintiffs, | |
| v. | |
| | By: Michael F. Urbanski |
| CLEVELAND CEMENT CONTRACTORS, INC. | United States District Court |
| Defendant. | |

## MEMORANDUM OPINION

Plaintiffs, the Laborers' District Council of Virginia Health and Welfare Trust Fund and Laborers' District Council of Virginia Pension Trust Fund (collectively, "the Funds"), bring this declaratory judgment action against defendant Cleveland Cement Contractors, Inc. ("Cleveland Cement") to collect fringe benefit contributions allegedly owed the Funds by Cleveland Cement. The Funds also seek an audit of Cleveland Cement's records and costs and liquidated damages pursuant to an alleged collective bargaining agreement and to section 502(g)(2) of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. 1132(g).

Presently before the court are cross motions for summary judgment filed by the Funds and Cleveland Cement. The parties have briefed the issues, and oral argument was held on November 8, 2013. For the reasons stated herein, the Funds' motion for summary judgment is **DENIED** and Cleveland Cement's motion for summary judgment is **GRANTED**.

**I.**

Cleveland Cement is an Ohio company which produces a variety of concrete installations. In 1971, after winning a contract to perform concrete work on a tobacco

manufacturing plant in Richmond, Virginia, Cleveland Cement opened an office in that city. On June 8, 1971, the company signed an Acceptance of Agreement with the Laborers' District Council of Virginia ("Laborers' District Council") approving the collective bargaining agreement in force between the Laborers' District Council and local contractors. In return, the Laborers' District Council Local Union 351 ("Laborers' Local Union 351") agreed to provide laborers for Cleveland Cement to hire "as needed for [the tobacco plant] contract." Decl. R. Simonetti, Dkt. No. 28-1 at 2.

The Acceptance of Agreement is commonly known in the construction industry as a pre-hire agreement.[1] While generally, an employer who deals with a union which has not attained the support of a majority of his workers commits an unfair labor practice, Garment Workers' Union v. NLRB, 366 U.S. 731, 737-38 (1961), an exception is made for employers in the construction industry. The National Labor Relations Act ("NLRA") permits such employers to make pre-hire agreements with a union regardless of its majority status representation. 29 U.S.C. § 158(f). The rationale underlying the construction industry exception was explained by the Ninth Circuit:

> As jobs begin and end, construction workers frequently change employers. Due to this, Congress has seen fit to allow so-called 'pre-hire' agreements in that industry. These agreements may be signed before the union represents a majority of the employer's employees, and may continue in duration through more than one of the employer's jobs, even if the employer goes through a high employee turnover. These agreements allow the employees some of the wage and benefit advantages of union representation, as well as relative wage stability. The employer is assured a qualified pool of workers to choose from when it needs them, protection against labor unrest during the period of the contract, and predictable labor costs, an invaluable tool in the bidding process.

---

[1] Under section 8(f) of the NLRA, a pre-hire agreement exists if 1) it covers employees who are engaged in the building and construction industry; 2) the agreement is with a labor organization of which building and construction employees are members; and 3) the agreement is with an employer engaged primarily in the building and construction industry. Clark v. Ryan, 818 F. 2d 1102, 1107 (1987) citing Operating Engineers Pension Trust v. Beck, 746 F.2d 557, 566 (9th Cir. 1984). The Funds have not contested Cleveland Cement's identification of the 1975 Acceptance of Agreement as a pre-hire agreement.

2

Todd v. Jim McNeff, Inc., 667 F.2d 800, 802 (9th Cir. 1982), aff'd 461 U.S. 260 (1983).

A pre-hire agreement, however, is not synonymous with a collective bargaining agreement and until a majority of employees indicate a willingness to be represented by a union, the pre-hire agreement is voidable. NLRB v. Iron Workers, 434 U.S. 335, 341 (1978); Clark v. Ryan, 818 F.2d 1102, 1107 (4th Cir. 1987); see also Industrial Turnaround Corp. v. NLRB, 115 F.3d 248, 254 (4th Cir. 1997).

On December 4, 1975, Cleveland Cement signed a second Acceptance of Agreement ("1975 Acceptance of Agreement") which superseded the 1971 Acceptance of Agreement. The 1975 Acceptance of Agreement provides, in part, as follows:

> The undersigned Employer has read and hereby approves the collective bargaining Agreement now in effect between the Laborers' District Council of Virginia and the Virginia Association of Contractors, Inc. and hereby accepts the same in its entirety, and becomes one of the parties thereto. The Employer hereby agrees to be bound by any subsequent renewals, modification, replacement, amendments and addenda to the Agreement…unless and until notice is given….
>
> Specifically included in this understanding is that the Employer agrees to pay the fringe benefits payments as outlined in the Agreement between the Laborers' District Council of Virginia and the Virginia Association of Contractors, Inc., and to withhold working dues established by the Union in keeping with the said Agreement.

Cleveland Cement did not have an election under the NLRA, and the NLRB never certified a union majority at the Richmond job site. Decl. R. Simonetti, Dkt. No. 28-1, at 2.

On January 27, 1983, Ronald Simonetti, who purchased Cleveland Cement in 1967 and became its president in 1968, wrote a letter to the Laborers' International Union of North America ("Laborers' International Union") stating that Cleveland Cement was terminating its national agreements. The letter states:

> Due to general business conditions, Cleveland Cement Contracting is terminating its national agreements. Please regard this letter as notice of cancellation of our

3

National Agreement with the Laborers' International Union of North America, pursuant to Article I of that Agreement. This action will be effective May 1, 1983.

January 27, 1983 Letter, Dkt. No. 28-5. On February 2, 1983, the Laborers' International Union responded to Mr. Simonetti, acknowledging the termination, as follows:

This will acknowledge receipt of your letter dated January 27, 1983, and advise that pursuant to your request the National Agreement you signed with this International Union in 1975 will be terminated effective May 1, 1983.

Our records will be changed and our Regional Offices will be notified of the termination.

February 2, 1983 Letter, Dkt. No. 28-6. Following the 1983 letter, Cleveland Cement has not signed any collective bargaining agreements with the Laborers' District Council or any successor unions, and the company has never been a member of the Virginia Association of Contractors, Inc. ("VAC").[2]

On May 1, 2007, the VAC entered into a Heavy Highway & Building Agreement with the Virginia and North Carolina Laborer's District Council "on behalf of" Construction and General Laborers' Local Union 351 ("2007 CBA").[3] Dkt. No. 26-3. Article XVII of the 2007 CBA provides for remittance, as follows:

The Employers will remit monthly (…) for all hours worked, contributions (on behalf of members and non-members of the bargaining unit) for the Health & Welfare Fund, Pension Fund, Training Fund, and the amount withheld for Initiation Fees, Working Dues, which shall be handled in conformity with the instructions on the forms furnished by the Virginia and North Carolina Laborers' District Council.

---

[2] The VAC negotiates with laborers' unions on behalf of contractors. Cleveland Cement has specifically declined requests to join the VAC. Decl. R. Simonetti, Dkt. No. 28-1, at 4.

[3] Cleveland Cement indicates that the Laborers' District Council "appears to no longer exist, but was evidently absorbed several years ago by the Virginia and North Carolina Laborers' District Council. The Virginia and North Carolina Laborers' District Council in turn no longer exists and has evidently been absorbed by the West Virginia Laborers' District Council." Dkt. No. 28, at 7.

The Funds assert that the 1975 Acceptance of Agreement binds Cleveland Cement to the 2007 CBA, including the provision requiring payment of fringe benefits for both union and non-union employees.[4]  The Funds further claim that the 2007 CBA binds Cleveland Cement to the "applicable Restated Agreements and Declarations of Trust" that establish and govern the Funds, and requires that Cleveland Cement permit an audit by the Funds.

The issue in this case is whether Cleveland Cement effectively repudiated the 1975 Acceptance of Agreement, and thus is not bound by the subsequent 2007 CBA between the VAC and the Virginia and North Carolina Laborers' District Council (on behalf of Local Union 351). The Funds assert that Cleveland Cement's 1983 letter to Laborers' International Union did not terminate the 1975 Acceptance of Agreement because it did not comply with the requirements for termination set forth in the 1975 Acceptance of Agreement.  Specifically, the Funds point to the language in the 1975 Acceptance of Agreement, which provides, in pertinent part, as follows:

> This Acceptance of Agreement shall continue in effect until terminated by registered letter to both the Laborers' District Council of Virginia and the Virginia Association of Contractors at least 120 days but not more than 150 days prior to the termination date of any existing contract between the parties.

Dkt. No. 26-2.  The Funds emphasize that the 1983 letter sent to the Laborers' International Union was not directed to the specified entities, was not sent by registered mail, and did comply with the required time frame.

Cleveland Cement counters that the 1983 letter effectively repudiated the 1975 Acceptance of Agreement.  The company asserts that, because the 1975 Acceptance of Agreement was a pre-hire agreement, effective repudiation need not comply with the termination provisions in the agreement.  Cleveland Cement states that, during the audit period identified in

---

[4] A Declaration from Karen Musgrove, Administrator of the Funds, indicates that an audit discovered that Cleveland Cement owes the Funds $1,618,338.65 in delinquent contributions for the period from August 31, 2010 through April 21, 2013.  Decl. Musgrove, Dkt. 26-1, at 2.  Cleveland Cement disputes the results of this audit.

5

this case, it voluntarily paid fringe benefits into the Funds for the few employees who were union members on various jobs in Virginia. During this time period, for its employees who are not union members, Cleveland Cement provided health and welfare benefits under its own benefit plan.

Cleveland Cement argues that submitting fringe benefit contributions on behalf of union members voluntarily does not create any obligation to make contributions for non-union members. Cleveland Cement also argues that, in the exercise of their ERISA fiduciary duties, the Funds should have determined the proper beneficiaries, and that the Funds are estopped from claiming damages because they have, over the course of thirty years, and despite several prior audits, accepted contributions for only the few Cleveland Cement employees who belonged to the union.[5] Further, audits performed by the Funds from 1983 to 2011 addressed arithmetic errors, with no claim from the Funds that Cleveland Cement had a contractual obligation to contribute for non-union employees until 2011.[6] The Funds filed this action on November 13, 2012.

## II.

Under Federal Rule of Civil Procedure 56, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Nguyen v. CNA Corp., 44 F.3d 234, 236-37 (4th Cir. 1995). When making this determination, the court should consider "the pleadings, depositions, answers to

---

[5] For the audit period from August 1, 2010 to September 30, 2011, Cleveland Cement has submitted contributions to the Funds for four employees who were union members in Virginia. Decl. M. Simonetti, Dkt. No. 28-2, at 4.

[6] Cleveland Cement submitted a letter from the Funds dated August 22, 2006 indicating that the "auditors found errors and omissions in the amount of $127.60" for the audit period from April 2005 to March 2006. Dkt. Nos. 28-8 & 28-9.

interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323; Nguyen, 44 F.3d at 237. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "All reasonable inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion," but "[a] mere scintilla of evidence supporting a case is insufficient." Nguyen, 44 F.3d at 237.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," and in considering each motion "the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (citation and internal quotation marks omitted). The fact that both sides moved for summary judgment "neither establish[es] the propriety of deciding a case on summary judgment, nor establish[es] that there is no issue of fact requiring that summary judgment be granted to one side or another." Continental Air., Inc. v. United Air., Inc., 277 F.3d 499, 511, n.7 (4th Cir. 2002) (citation and internal quotation marks omitted). Summary judgment is an extraordinary remedy, which should be granted prudently, especially where the subjective factors of motive and intent figure

7

centrally. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473 (1962). However, here there is no genuine dispute as to any material fact. The Court finds that Cleveland Cement effectively repudiated the 1975 Acceptance of Agreement, and thus was not bound by the subsequent 2007 CBA to pay fringe benefits to the Funds or submit to an audit.

## III.

### A. Repudiation of 1975 Acceptance of Agreement

#### 1. Right to Repudiate

In McNeff, 461 U.S. 260, the Supreme Court held that pre-hire agreements are voidable as applied to section 301 actions by pension fund trustees to enforce the fringe benefits provisions of pre-hire agreements. Id. at 270 ("[T]he voidable nature of pre-hire agreements clearly gave petitioner the right to repudiate the contract."). Relying on McNeff, the Fourth Circuit has concluded that a "pre-hire agreement may be repudiated at any time by either party prior to the union's achievement of majority status." Clark, 818 F.2d at 1107; see also Industrial Turnaround Corp., 115 F.3d at 254; but see John Deklewa & Sons, Inc., 282 N.L.R.B. 1375 (1987), enforced sub nom., International Ass'n of Iron Workers v. NLRB ("Deklewa"), 843 F.2d 770 (3d Cir.), cert. denied, 488 U.S. 889 (1988) (The NLRB abandoned the rule permitting unilateral repudiation).[7] Here, it is undisputed that the union did not establish majority status. Thus, because an § 8(f) pre-hire agreement is voidable by repudiation until the union establishes

---

[7] In Deklewa, the NLRB overruled a number of its prior decisions and held that § 8(f) collective-bargaining agreements may not be unilaterally repudiated by employers or unions. However, in Industrial Turnaround Corp., the Court of Appeals for the Fourth Circuit specifically declined to adopt Deklawa, stating:
> We recognize that several Circuits have deemed the NLRB's current interpretation of § 8(f) to be reasonable and have adopted Deklewa. (…) [However], [w]e are precluded from adopting Deklewa as the law of the Circuit because it stands in conflict with Clark v. Ryan, 818 F.2d 102, a prior panel opinion of this court. In Clark, we unequivocally held - contrary to Deklewa - that 'pre-hire agreement may be repudiated at any time by either party prior to the union's achievement of majority status.' In reaching this conclusion, we relied on the Supreme Court's decision in Jim McNeff, Inc. v. Todd, 461 US. at 269-270, which itself held that § 8(f) agreements are subject to repudiation until the union establishes majority status in a § 9(a) election.

115 F.3d at 254. (citation and internal quotation marks omitted).

8

majority support, and because it is undisputed that the union has never achieved majority status, Cleveland Cement had the right to repudiate the 1975 Acceptance of Agreement. As discussed below, the court finds that Cleveland Cement's conduct following the 1983 letter to the International Union constituted effective repudiation.

### 2. Proper Repudiation

In McNeff, The Supreme Court specifically declined to address what would constitute repudiation of an 8(f) agreement:

> It is not necessary to decide in this case what specific acts would affect the repudiation of a pre-hire agreement -- sending notice to the union, engaging in activity overtly and completely inconsistent with contractual obligations, or, as respondents suggest, precipitating a representation election pursuant to the final proviso in § 8f that shows the union does not enjoy majority support.

Id. at 270, n.11. Absent an express direction as to what actions constitute repudiation or sufficiently communicate to a union or pension fund an intent to repudiate, courts must consider the facts and circumstances of each case.

In the instant case, Cleveland Cement notified Laborers' International Union by letter dated January 27, 1983 that it was "terminating its national agreements." Dkt. No. 28-5. The letter stated that "effective May 1, 1983" Cleveland Cement was cancelling the National Agreement with the Laborers' International Union. An employer may repudiate a § 8(f) agreement by "providing notice to the union." Clark, 818 F.2d at 1107; see also McNeff, 461 U.S. at 270, n.11.

Cleveland Cement asserts that the local unions and district councils (i.e. Laborers' Local Union 351 and the VAC) are members of the Laborers' International Union and argues that "notice to the [Laborers'] International Union coupled with the International Union's express

9

statement that it would notify the local chapters constitutes proper notice to the local union."[8] D.'s Reply in Supp. Summ. J., Dkt. No. 39, at 5. However, the Funds have submitted an affidavit from Gregory Davis, Director of the Construction Department of the Laborers' International Union, stating that the National Union did not have any authority to terminate agreements between the Laborers' District Council and the VAC (and any successor agreements between those entities or their successors).[9] Decl. G. Davis, Dkt. 38-1, at 2. The Funds assert that, while the 1983 letter may have terminated Cleveland Cement's agreement with the Laborers' International Union, it would not have terminated "any separate and distinct agreements between the [Laborers' District Council] and the VAC."[10] Id. Thus, there is a dispute of fact regarding whether the letter to the Laborers' International Union provided effective notice of repudiation of the 1975 Acceptance of Agreement.

However, the court need not determine whether the 1983 letter, standing alone, effectively repudiated Cleveland Cement's agreement with the Laborers' District Council and the VAC because the court finds that even if the January 27, 1983 letter did not provide sufficient notice of repudiation, the actions of Cleveland Cement in the nearly thirty years following the 1983 letter sufficiently communicated an intent to repudiate. Viewing an

---

[8] In Industrial Turnaround Corp., the Fourth Circuit Court of Appeals held that an employer provided effective notice of repudiation of a pre-hire agreement by notifying the local union and the Virginia Chapter of the National Electrical Contractors Association. 115 F.3d at 255. However, in the instant case the record does not indicate whether the Laborers' International Union communicated with the local union regarding the contents of the 1983 letters.

[9] The Funds argument that the National Union would not have "authority to terminate [Cleveland Cement's] obligations under the 1975 Acceptance of Agreement" lacks merit because in the Fourth Circuit the employer may unilaterally terminate pre-hire agreements. Clark, 818 F. 2d 1102.

[10] The Funds also argue that the letter could not constitute effective repudiation because it did not comply with the termination provision in the Acceptance of Agreement which required "a registered letter to both the Laborers' District Council of Virginia and the Virginia Association of Contractors at least 120 days but not more than 150 days prior to the termination date of any existing agreement between the parties." Dkt. No. 26-2. This argument lacks merit as, under Clark, an employer's notice of repudiation is not required to comply with the termination provisions if the agreement is a pre-hire agreement. Id. at 1107.

employer's acts on a continuum, the magnitude of noncompliance "can be so bald as to put the union on notice of the employer's intent to repudiate." Todd v. Jim McNeff, Inc., 677 F.2d at 804; see also Eastern Dist. Council of Carpenters v. Blake Construction Co., 457 F. Supp. 825, 831 (E.D.Va.1978) (In some circumstances, notice of an employer's intent to repudiate may be imparted by conduct.); see also NLRB v. D.L. Baker, Inc., Nos. 96-1377 & 96-1548, 1997 U.S. App. LEXIS 251, at * 8-9, 1997 WL 5771, at *3 (4th Cir. 1997) (Noting that "[u]nder McNeff and Clark, [] acts sufficient to repudiate the prehire agreement require at least that the Union have some form of notice of the inconsistent conduct.); Clark, 818 F.2d at 1107 ("Section 8(f) imparts a flexibility to collective bargaining agreements; its purposes are best served by requiring simply that notice to repudiate be sufficient under the circumstances.")[11]

Following the 1983 letter, Cleveland Cement has paid no fringe benefits for non-union employees to the Funds, and not until 2011 did the Funds complain that Cleveland Cement was in breach of any agreement. Decl. R. Simonetti, Dkt. No. 28-1, at 6; Decl. M. Simonetti, Dkt. No. 28-2, at 9.[12] Further, Cleveland Cement indicates that its employees are not classified in accordance with the 2007 CBA's classifications, and the company sets its "own wage rates, seniority rules, benefits and work rules and does not follow the requirements of the [2007 CBA]." D's Opp. to Summ. J., Dkt. No. 37, at 7-8; Decl. M. Simonetti, Dkt No 28-2, at 4-5.[13]

---

[11] The Court of Appeals for the Fourth Circuit remanded Clark to the district court for a determination of whether an 8(f) agreement existed, and, if so, whether it was repudiated. However, the district court applied Deklewa retroactively, and found that the employer could not unilaterally repudiate a pre-hire agreement. Clark v. Ryan, 1989 U.S. Dist. LEXIS 18106 (W.D. Va. Sept. 6, 1989). Subsequently, the Fourth Circuit made clear that Deklewa is not the law in this circuit. Industrial Turnaround, 115 F.3d 255.

[12] The Funds wrote Cleveland Cement a letter on November 7, 2011 attaching the 1975 Acceptance of Agreement, as well as the 2007 CBA. November 7, 2011 Letter, Dkt. No. 28-13.

[13] Current President of Cleveland Cement, Michael Simonetti states in his declaration as follows:
> Cleveland Cement does not classify its employees in the same way that the Collective Bargaining Agreement classifies them. For instance, many of its employees perform multiple tasks typical of both unskilled laborers and more skilled finishers and mixers, so they aren't classified in accordance with the CBS's formal and rigid classifications. Also, the company sets its own wage

In Eastern Dist. Council of Carpenters, the court found the employer had repudiated a national agreement, which is similar to a pre-hire agreement, where the employer materially breached all the terms of the agreement by nonpayment of union scale wages or fringe benefits, refusal to use the hiring hall, and oral communication of intent to repudiate. 457 F. Supp. at 831; see also Suburban Teamsters v. Callaghan Paving, Inc., 583 F. Supp. 105, 109 (N.D. Ill. 1984) (Written notice of repudiation is not necessary to a finding that the pre-hire agreement has been repudiated.)

The court finds that Cleveland Cement's conduct, including sending notice to the Laborers' International Union that it was cancelling its National Agreement, receiving a response from the Laborers' International Union that the "Regional Offices will be notified of the termination," not paying fringe benefits for non-union employees, and not following union rules regarding wage rates, seniority, and benefits, provided sufficient notice of Cleveland Cement's intent to repudiate the 1975 Acceptance of Agreement. Accordingly, the Court finds that Cleveland Cement properly repudiated the 1975 Acceptance of Agreement well before the effective date of the 2007 CBA, and thus, Cleveland Cement is not bound by the 2007 CBA.[14]

**B. Requirement of a Written Contract**

However, the Funds assert that, even absent a written collective bargaining agreement, Cleveland Cement's conduct manifests an intention be bound which satisfies the "written agreement" requirement of 29 U.S.C. § 186(c)(5). The Funds attempt to characterize Cleveland

---

rates and does not follow the rates listed in the CBA. The Company does not follow the CBA "High Pay" policy where employees are paid a premium rate to erect and dismantle tower and scaffolding in excess of fifty feet. In addition the Company has not adopted the CBA's grievance procedures, nor does it follow the CBA's seniority rules, work rules or benefits.

Dkt. No. 28-2, at 4-5.

[14] The court also notes that a finding that Cleveland Cement repudiated the pre-hire agreement will not upset the plans or security of any employee of Cleveland Cement, as the company provided health insurance for employees during the period between August 1, 2010 and September 30, 2011, and these employees will not be making claims for benefits for this expired period.

12

Cement's actions in the years following the 1983 letter as "creat[ing] an obligation to contribute to the Funds." Pl.'s Resp. in Opp. to Summ. J., Dkt. No. 36, at 6. The Funds' also assert that Cleveland Cement's conduct shows an intention to be bound because the company "regularly made timely contributions and submitted remittance reports to the Funds for hours worked by covered union employees" after the purported repudiation in 1983. Id., at 3. The Funds assert that Cleveland Cement continued to file monthly contribution reports which contained language stating that it was bound by the provisions of a collective bargaining agreement.[15] The Funds argue that this declaration manifests an intention to continue to be bound by the 1975 Acceptance of Agreement.

In response, Cleveland Cement argues that the 1975 Acceptance of Agreement was repudiated, and the Fourth Circuit has "unequivocally held that a written agreement is required and that conduct alone is not enough to manifest an intention to be bound." Cleveland Cement asserts that payments made to the Funds were made voluntarily for union employees only, and that the payments were not intended to imply or confirm the existence of a collective bargaining agreement. Cleveland Cement President Michael Simonetti avers that two administrative employees filled out and signed the contribution reports, but neither employee was instructed to sign the declaration box, nor had authority to enter into contracts on behalf of Cleveland Cement. Decl. M. Simonetti, Dkt. 39-1, at 1.

---

[15] The Funds argue that Cleveland Cement submitted 23 monthly remittance reports where a representative signed a declaration indicating as follows:
> The above contractor affirms and declares that it is a party to a written agreement requiring contributions to the Laborers' District Council of Virginia Funds, and also agrees to be bound by the terms of the Funds' Agreement and Declarations of Trust and also certifies that this report only includes employees covered under the terms of a collective bargaining with the Laborers' International Union of North America, or its local union affiliates and does not include a sole proprietor or partner of the contractor.

Dkt. No. 36, at 7.

Section 302(a) of the LMRA prohibits employers from making payments to representatives of employees unless the payments fall within one of the statutory exceptions. 29 U.S.C. § 186(a). One of these exceptions is found in Section 302(c)(5)(B), and allows employers to make contributions to a trust fund for employees where "the detailed basis on which such payments are to be made is specified in a written agreement." 29 U.S.C. § 186(c)(5)(B).[16] Section 302 is structured to insure that employer contributions are made only for proper purposes and that fund benefits reach only proper parties. Bricklayers Local 15 v. Stuart Plastering Co., 512 F.2d 1017, 1025 (5th. Cir. 1975); see also Arroyo v. United States, 359 U.S. 419, 425-26 (1959).

Case law from the Fourth Circuit indicates that, while conduct alone is not sufficient to show an intent to be bound to a trust fund agreement, the "writing requirement is not formalistic." Masters, Mates & Pilots Pension Plan v. Lowen, Case No. 97-2671, 1998 U.S. App. LEXIS 22103, n. 2, 1998 WL 614136, n. 2 (4th Cir. 1998) (unpublished) (internal citations omitted) (Listing different types of documents which have been held to satisfy section 302 including payroll sheets, fringe benefit forms, remittance reports detailing the contributions and the employees to be credited, and an expired collective bargaining agreement.) However, even assuming that fringe benefit forms or contribution reports could theoretically satisfy the writing requirement of section 302, those documents are not adequate in the instant action.

Indeed, the cases cited by the Funds for the proposition that the submission of remittance reports "manifested Cleveland Cement's continued intent to be bound by the terms of the CBA

---

[16] This exception provides in relevant part:
> The provisions of this section shall not be applicable…(5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): Provided, That…(B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer….

and Trust Agreements" do not support plaintiffs' position. Pl.'s Mot. for Summ. J., Dkt. No. 26, at 6. In each of these cases, the remittance forms were only one part of a pattern of behavior indicating an intent to be bound to the collective bargaining agreement. For instance, in Bricklayers Local 21 of Ill. Apprenticeship & Training Program v. Banner Restoration, Inc., 385 F.3d 761, 767-768 (7th Cir. 2004), the Seventh Circuit found that the employer had stipulated to conduct manifesting assent to the terms of the collective bargaining agreement, including paying wages at the rates prescribed by the agreement, requesting bricklayers from the local union, donating a truck to the local union training program, and failing to challenge jurisdiction after the Joint Arbitration Board found it guilty of labor violation charges under the collective bargaining agreement brought by another local union during three successive years. In Brown v. C. Volante Corp., 194 F.3d 351, 354-56 (2d Cir. 1999), the Second Circuit found that employer conduct manifested an intent to adopt two subsequent unsigned collective bargaining agreements when the employer paid its employees in compliance with the union scale, contributed to the funds at the rate prescribed in the unsigned collective bargaining agreements, including for a non-union employee, and wrote a letter acknowledging "a responsibility to the funds." Id. at 351. In Line Constr. Benefit Fund v. Allied Elec. Contractors., Inc., 591 F.3d 576, 580-581 (7th Cir. 2010), the Seventh Circuit found that the employer was bound by a 2005 collective bargaining agreement to make contributions, even though it did not execute a formal letter of consent until 2006. However, in that case, the employer had made contributions to the fund for multiple years prior to the collective bargaining agreement, and except for three months, continued to make contributions according to the collective bargaining agreement. See also Washington Area Pension Fund v. Mergentime Corp., 743 F. Supp. 422, 427 (D. Md. 1990) (employer had signed other agreements directly applicable to the disputed payments, in addition to the remittance

15

forms.) Clearly, the employers and the unions in all of these cases had much more extensive ongoing contractual relationships than the one at issue here.

In contrast, Cleveland Cement's actions have not been consistent with the existence of a collective bargaining agreement, and the contribution payments do not imply an intent to be bound. Since 1983, Cleveland Cement has made trust fund contributions only for employees who were union members. Further, Cleveland Cement has hired non-union workers, has not paid the prevailing union hourly wage scale, and has not classified its workers in accordance with the 2007 CBA. Finally, Cleveland Cement's submission of contribution reports for union workers does not show an intent to be bound, regardless of whether a Cleveland Cement employee signed the declaration box on some of reports. Michael Simonetti, President of Cleveland Cement since 2006, has averred that he never authorized the employees who filed the contribution report to enter into any contracts on behalf of Cleveland Cement, nor were they authorized to sign the declaration box, and the Funds have offered no evidence to contradict this assertion. See Firesheets v. A.G. Bldg. Specialists, 134 F.3d 729, 731 (5th Cir. 1998) (holding that contribution payments do not evidence an intent to be bound and noting that when the employer's "actions, by and large, are inconsistent with the creation of a new agreement, [] the existence of some boilerplate language on the record-keeping documents for the contributions does not bind [the employer]."); see also Trs. of Plasters Local 67 Pension Trust Fund v. Martin McMahon Plastering, Inc., 844 F. Supp. 2d 843, 848 ( E.D. Mich. 2012).

Accordingly, the court holds that Cleveland Cement's conduct following the 1983 letter does not manifest an intention to continue to be bound by the 1975 Acceptance of Agreement and thus does not satisfy the "written agreement" requirement under 29 U.S.C. § 186(c)(5).[17]

**IV.**

For the foregoing reasons, plaintiffs' motion for summary judgment is **DENIED** and defendant's motion for summary judgment is **GRANTED.**

An appropriate order will be entered.

Entered: March 17, 2014

*/s/ Michael F. Urbanski*

Michael F. Urbanski
United States District Judge

---

[17] Because the court finds that Cleveland Cement's conduct effectively communicated an intent to repudiate the 1975 Acceptance of Agreement, and that Cleveland Cement is not bound by the 2007 CBA, it is unnecessary to reach the issue of whether the Funds are estopped from claiming damages.